# Supreme Court of Wisconsin

| | |
|---|---|
| CASE No.: | 2018AP1476-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>              Plaintiff-Respondent,<br>        v.<br>Octavia W. Dodson,<br>              Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 187,949 N.W.2d 879
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | January 26, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 13, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Joseph M. Donald |

JUSTICES:

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Jorge R. Fragoso*, assistant state public defender. There was an oral argument by *Jorge R. Fragoso*.

For the plaintiff-respondent, there was a brief filed by *Donald V. Latorraca*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Donald V. Latorraca*.

**2022 WI 5**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP1476-CR
  (L.C. No. 2016CF1316)

STATE OF WISCONSIN                    :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Octavia W. Dodson,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**JAN 26, 2022**

Sheila T. Reiff
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1  JILL J. KAROFSKY, J. Octavia W. Dodson seeks resentencing for his second-degree intentional homicide conviction, alleging that the Milwaukee County Circuit Court relied on an improper sentencing factor in mentioning his lawful gun ownership and conceal-carry (CCW) permit.[1]  He contends such reliance contravenes his rights under the Second Amendment to the

---

[1] The Honorable M. Joseph Donald presided over sentencing.

United States Constitution.  The circuit court denied Dodson's postconviction motion for resentencing, and the court of appeals affirmed that denial.[2]  We likewise affirm.  Dodson fails to prove by clear and convincing evidence that the circuit court actually relied on an improper factor.  Accordingly, his sentence stands.

## I.  BACKGROUND

¶2  On March 25, 2016, Dodson shot and killed Deshun T. Freeman.  Roughly four minutes before the homicide, Dodson was involved in a minor car accident during which an unidentified driver——in what Dodson believed to be a Buick[3]——collided with the rear of Dodson's car.  Dodson exited his vehicle and as he walked toward the back of his car, the other driver reversed the Buick several car-lengths and sped off.  Meanwhile, Dodson unholstered his pistol, which he lawfully owned and for which he had a valid CCW permit.[4]

¶3  Dodson returned to his car and attempted to follow the Buick but lost sight of it.  While searching for the Buick, Dodson swapped out his pistol's ten-round magazine for an extended 17-round magazine.  Soon thereafter Dodson spotted a second Buick driven by the victim, Deshun Freeman.  Believing it to be the car

---

[2] State v. Dodson, No. 2018AP1476-CR, unpublished slip op. (Wis. Ct. App. Aug. 25, 2020) (affirming the postconviction order of the Honorable Carolina Stark of the Milwaukee County Circuit Court).

[3] This opinion will refer to the striking vehicle as "the Buick."

[4] A CCW permit authorizes a qualifying person to carry a concealed weapon in Wisconsin, except in enumerated circumstances. See generally Wis. Stat. § 175.60 (2019-20).

2

that rear-ended him, Dodson pursued Freeman's vehicle.   When Freeman pulled over to the side of the road, Dodson parked his car about two car-lengths behind.

¶4   According to Dodson, Freeman began "fumbling around" by his driver-side door before starting to walk toward Dodson.   At that point, Dodson exited his vehicle and stood between the open driver-side door and his car.   Dodson told officers that Freeman, with his hands either in his pockets or underneath his sweatshirt, began running toward Dodson, and shouted an obscenity at him. Dodson responded by firing six rounds from his pistol, three of which hit and killed Freeman.   After witnessing Freeman's body fall to the ground, Dodson fled the scene.   Hours later, Dodson surrendered himself to the police.   The investigation revealed that Freeman had not been armed and that Freeman's vehicle did not match Dodson's description of the Buick from the earlier collision.

¶5   The State charged Dodson with second-degree intentional homicide, citing unnecessary defensive force as the mitigating circumstance.[5]   The charge included the "use of a dangerous weapon" penalty enhancer.[6]   As the result of plea negotiations, the State dismissed the dangerous-weapon penalty enhancer in exchange for Dodson's guilty plea to second-degree intentional homicide.

¶6   At the sentencing hearing, the circuit court determined that despite Dodson being an otherwise "model citizen," the gravity

---

[5] See Wis. Stat. §§ 940.01(2)(b) & 940.05(1) (2015-16).   All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

[6] See Wis. Stat. § 939.63(1)(b).

and serious nature of the crime warranted 14 years of initial confinement followed by six years of extended supervision. As the circuit court explained:

> In reviewing this case, I have to say I am completely baffled as to why this happened. And I don't think that there is any rational way of trying to explain it. I can tell you this, Mr. Dodson, that in my experience as a judge, I have seen over time how individuals when they are possessing a firearm, how that in some way changes them. It changes how they view the world. It changes how they react and respond to people. I know that this is only speculation on my part, but I do strongly feel that the day that you applied for that concealed carry permit and went out and purchased that firearm, and that extended magazine, whether your rational beliefs for possessing it, whether you felt the need to somehow arm yourself and protect yourself from essentially the crime that is going on in this community I think on that day set in motion this circumstance.
>
> It is clear to me, Mr. Dodson, that for whatever reason, and it appears that it is a distorted, misguided belief of the world that somehow Mr. Freeman was a threat that required you, in essence, to terminate his life. Makes no sense.
>
> . . . [I]t is clear to me that you were operating under some misguided belief, some distorted view of the world that somehow [Deshun] Freeman was a threat to you when in reality it was nothing further from the truth.

¶7 In a postconviction motion, Dodson argued that the circuit court's statements demonstrated an improper reliance on his gun ownership and CCW permit, in contravention of his Second Amendment rights.[7] The postconviction court denied the motion,

---

[7] Dodson's postconviction motion also sought to withdraw his guilty plea, alleging that he received ineffective assistance of counsel. He does not pursue that relief in this appeal.

4

concluding that the challenged statements, in context, were not improper.  The court of appeals affirmed, holding that the sentencing court's statements demonstrated that Dodson was being punished not for exercising his Second Amendment rights but rather his "distorted, misguided belief" that he could unlawfully and lethally use his gun against the unarmed Freeman.  See State v. Dodson, No. 2018AP1476-CR, unpublished slip op., ¶¶16-18 (Wis. Ct. App. Aug. 25, 2020).  We granted Dodson's petition for review.

## II.  STANDARD OF REVIEW & APPLICABLE LAW

¶8  We review a circuit court's sentencing decision for an erroneous exercise of discretion.  State v. Dalton, 2018 WI 85, ¶36, 383 Wis. 2d 147, 914 N.W.2d 120.  A circuit court erroneously exercises its sentencing discretion when it "actually relies on clearly irrelevant or improper factors."  Id.  Accordingly, a defendant challenging his or her sentence must prove by clear and convincing evidence that:  (1) the challenged factor is irrelevant or improper; and (2) the circuit court actually relied on that factor.  State v. Pico, 2018 WI 66, ¶48, 382 Wis. 2d 273, 914 N.W.2d 95.

¶9  Under the improper-factor prong, sentencing factors are proper when they inform valid sentencing objectives including "the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others."  State v. Gallion, 2004 WI 42, ¶40, 270 Wis. 2d 535, 678 N.W.2d 197; see also Wis. Stat. § 973.017(2).  Primary factors informing those objectives are the gravity of the offense, the defendant's

5

character, and the need to protect the public. Gallion, 270 Wis. 2d 535, ¶44. Secondary factors include:

> (1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention.

Id., ¶43, n.11. Finally, a circuit court may properly entertain a "general predisposition[], based upon his or her criminal sentencing experience" so long as that predisposition is not "so specific or rigid" that it "ignore[s] the particular circumstances of the individual offender." State v. Ogden, 199 Wis. 2d 566, 573, 544 N.W.2d 574 (1996).

¶10 Under the actual-reliance prong, we review the sentencing transcript as a whole and assess any allegedly improper comments within that context. State v. Williams, 2018 WI 59, ¶52, 381 Wis. 2d 661, 912 N.W.2d 373. To prove actual reliance a defendant must identify where in the transcript the circuit court both gave "explicit attention" to an improper factor and made the improper factor a part of the "basis for the sentence." Id. Therefore, a defendant will fall short of proving actual reliance if the transcript lacks clear and convincing evidence that the factor was the sole cause of a harsher sentence. Id., ¶¶45-46, 53. A defendant will also fail to show actual reliance if a

6

reference to a challenged factor bears "a reasonable nexus" to a relevant, proper factor. <u>Id.</u>, ¶53.

### III. ANALYSIS

¶11 Turning from the law to the case before us, Dodson isolates two statements that he contends offer clear and convincing evidence that the circuit court actually relied on an improper factor. First, Dodson contends that the circuit court improperly grafted a negative predisposition against all gun owners onto him when it said that it has seen how "possessing a firearm" "changes how they view the world" and "react and respond to people." Second, Dodson argues that the circuit court improperly relied on his gun ownership and CCW permit when it stated that "the day that you applied for that concealed carry permit and went out and purchased that firearm, and that extended magazine . . . set in motion this circumstance."

¶12 We disagree. Dodson's arguments ignore critical context that, when read alongside the challenged statements, demonstrate the circuit court neither exhibited an improper predisposition against all gun owners nor actually relied on Dodson's gun ownership or CCW permit as part of his sentence. Our analysis begins by providing the full context surrounding the challenged statements. We then assess the challenged statements in their proper context under the established law.

### A. Context

¶13 The circuit court's challenged statements arise in the context of its struggle to reconcile Dodson's clean criminal record and the innocuous circumstances leading up to the shooting, with

7

an element of Dodson's second-degree homicide charge:  his use of unnecessary defensive force.  See Wis. Stat. § 940.01(2)(b).  That is, the circuit court was trying to understand what caused this "model citizen" to harbor the unreasonable belief that either he "was in imminent danger of death or great bodily harm" or the lethal "force used was necessary to defend [himself]."  Id.  This inquiry into how the particular facts establish an element of the offense is a necessary step in assessing the gravity of that offense——a proper sentencing factor.  See Wis. Stat. § 973.017(2)(ag); Gallion, 270 Wis. 2d 535, ¶44.

¶14  The circuit court then leaned on its judicial experience to hypothesize about why Dodson used unnecessary defensive force. The circuit court explained that in its "experience as a judge," it observed a recurring pattern wherein "possessing a firearm" changes how some criminal defendants "view the world" and "react and respond to people."  From the circuit court's standpoint that pattern was apparent here:  Dodson reacted unreasonably to Freeman because Dodson was armed with a gun.  That is, absent the gun, Dodson would not have used lethal force.  But Dodson did have the gun and a "distorted, misguided belief of the world that somehow Mr. Freeman was a threat," which as Freeman's murder tragically demonstrates, created a danger to the community——another proper sentencing consideration.  See Wis. Stat. § 973.017(2)(ad); Gallion, 270 Wis. 2d 535, ¶44.

### B.  Predisposition

¶15  Having established the full context in which the circuit court made the challenged statements, we next assess the statements

8

in that context. Dodson first challenges the circuit court's comment about gun possession changing how some criminal defendants both "view the world" and "react and respond to people" as an improper predisposition against all gun owners or CCW permit holders. Dodson is incorrect. The transcript read as a whole shows that the circuit court properly cabined any "general predisposition[]" about "when a certain type of sentence is appropriate" both to its "criminal sentencing experience" and to the "particular circumstances" of Dodson's criminal conduct. See Ogden, 199 Wis. 2d at 573. Indeed, nothing in the transcript indicates that this predisposition was "so specific or rigid as to ignore" Dodson's "distorted, misguided" conduct here, which included:

- Tracking down the first Buick instead of reporting the minor collision;

- Swapping out a regular-capacity magazine for an extended 17-round magazine when tracking down the first driver, indicating that he anticipated a violent confrontation;

- Failing to either record the license plate or call the police when he began following Freeman's vehicle;

- Exiting his car when Freeman pulled over instead of driving away from the confrontation;

- Firing six rounds at the unarmed Freeman as he approached.

See id. Accordingly, Dodson fails to meet his burden to prove an improper predisposition.

### C. Actual Reliance

9

¶16 Dodson likewise fails to prove by clear and convincing evidence that the circuit court improperly relied on his Second Amendment activities when it speculated that "the day" Dodson obtained his gun, extended magazine, and CCW permit "set in motion" the homicide. Assuming without deciding that this statement contained an improper factor, the transcript lacks evidence of actual reliance in at least two regards. For one, when read in context this statement "bore a reasonable nexus" to relevant and proper sentencing factors. See Williams, 381 Wis. 2d 661, ¶53. As explained above, the circuit court made this statement while assessing both the offense's gravity, by addressing its "unnecessary defensive force" element, and the need to protect the public from the danger of Dodson's "distorted, misguided" view of innocent community members. See Wis. Stat. § 973.017(2); Gallion, 270 Wis. 2d 535, ¶44.

¶17 Second, nothing in the transcript suggests that the circuit court increased Dodson's sentence solely because he owned a gun or sought permission to carry it concealed. The circuit court acknowledged that its reference to these activities was "only speculation" about what caused an otherwise "model citizen" to react to Freeman so unreasonably. Nowhere did the circuit court indicate that Dodson received a longer sentence because he purchased the gun or applied for the CCW permit or that those activities formed the "basis for the sentence." See Williams, 381 Wis. 2d 661, ¶52. Indeed, this transcript stands in stark contrast to the one in State v. Dalton that contained statements such as "you will be punished for [exercising your constitutional right]

10

today" and "[exercising that right is] going to result in a higher sentence for you."  383 Wis. 2d 147, ¶21.  While a sentencing transcript need not contain statements as direct as those in <u>Dalton</u> to meet the clear-and-convincing threshold, the statements here fall short of that mark.  For that reason, we cannot disturb the circuit court's wide sentencing discretion.  <u>See</u> <u>Williams</u>, 381 Wis. 2d 661, ¶¶45-47.

### IV.  CONCLUSION

¶18  Dodson fails to prove by clear and convincing evidence that the circuit court actually relied on an improper factor. Accordingly, Dodson's sentence stands.

*By the Court.*—The court of appeals' decision is affirmed.

¶19 BRIAN HAGEDORN, J. *(concurring)*. I join the majority opinion, but write separately to make two points.

¶20 First, this case turns on how you view the sentencing transcript. I read the transcript the same way the postconviction court and court of appeals did. The circuit court was trying to comprehend how Dodson came to have a "distorted, misguided belief of the world that somehow Mr. Freeman" posed a deadly threat. So, drawing on a pattern it sometimes observed in criminal defendants who previously purchased firearms, the circuit court offered its "speculation" about how Dodson developed the criminal mindset that precipitated an inexplicable and "baffl[ing]" homicide. Understood in this context, the circuit court was not declaring that all gun owners or CCW licensees develop a warped mindset toward the world around them. Rather, the circuit court suggested that in its experience, some do, and speculated that perhaps this could explain Dodson's actions. To be sure, the circuit court could have been clearer. But Dodson's contention that the court punished him solely for exercising his Second Amendment rights is unsupported by the sentencing transcript.

¶21 Second, as the majority explains, we employ a two-pronged analysis when reviewing whether a sentencing court relied on an improper factor. We consider: (1) whether the challenged factor was improper, and (2) whether the sentencing court actually relied on that factor. State v. Pico, 2018 WI 66, ¶48, 382 Wis. 2d 273, 914 N.W.2d 95. Tracking the analysis in a prior case, the majority concludes Dodson did not prove actual reliance——in part because the discussion of Dodson's lawful gun possession

1

shared a "reasonable nexus" with "relevant and proper sentencing factors." Majority op., ¶16; State v. Williams, 2018 WI 59, ¶53, 381 Wis. 2d 661, 912 N.W.2d 373. While the majority's approach comports with our prior discussion of the actual reliance prong, in my view, the reasonable nexus analysis more properly belongs under the improper factor prong.

¶22 Logically, whether something bears a reasonable nexus to permissible sentencing considerations goes not to whether it was improperly relied upon, but to whether the consideration was proper in the first place. State v. J.E.B. is a case in point. 161 Wis. 2d 655, 469 N.W.2d 192 (Ct. App. 1991). There, the circuit court discussed the defendant's tendency to read graphic novels containing "descriptions of adults having sexual contact with children." Id. at 659. Reading the novels, however, was a constitutionally protected activity. Id. at 663. The court of appeals concluded that referencing this protected material was not off limits because there was "a reliable showing of a sufficient relationship" between the protected activity and the criminal conduct. Id. at 673. Therefore, even though constitutionally protected activity was discussed, it was not improper because it was tied to an appropriate and relevant sentencing consideration. Federal courts evaluate these types of sentencing challenges under this same analytical framework. See Dawson v. Delaware, 503 U.S. 159, 166-67 (1992); United States v. Schmidt, 930 F.3d 858, 862-67 (7th Cir. 2019).

¶23 In this case, the majority correctly explains that the circuit court's discussion of Dodson's gun possession was not about

2

all gun owners; it was directly connected to Dodson's criminal mindset and bore a reasonable nexus to the gravity of his offense and the need to protect the public. Majority op., ¶16. While the majority thus concludes there was no actual reliance, it would be more analytically precise to hold that the reference to Dodson's gun possession did not constitute an improper factor. Nevertheless, I acknowledge our precedent has employed a reasonable nexus test under the actual reliance prong and therefore join the majority opinion.

¶24 REBECCA GRASSL BRADLEY, J. *(dissenting).* "[H]oplophobia" is the "irrational fear of guns." Wis. Judicial Comm'n v. Woldt, 2021 WI 73, ¶91, 398 Wis. 2d 482, 961 N.W.2d 854 (Rebecca Grassl Bradley, J., concurring/dissenting). "Constitutional rights must not give way to hoplophobia." Mance v. Sessions, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from a denial of a rehearing en banc). In this case, the sentencing judge's hoplophobia was on full display——he gave Octavia Dodson a particularly harsh sentence because Dodson legally purchased and carried a firearm.[1] In doing so, the sentencing judge violated Dodson's constitutional right to keep and bear arms and deprived Dodson of due process of law.

¶25 The majority ignores the facts in an effort to legitimize Dodson's unlawful sentence. It whitewashes what actually happened at the sentencing hearing by downplaying and twisting the sentencing judge's remarks. In its opening paragraph, the majority minimizes Dodson's argument as the sentencing judge "relied on an improper sentencing factor in mentioning his lawful gun ownership and concealed-carry (CCW) permit."[2] As the record reflects, the sentencing judge imbued his entire sentencing rationale with the fact of Dodson's lawful gun ownership and possession, repeatedly emphasizing not only how such lawful activity influenced Dodson's behavior, but how it "changes" people who exercise their

---

[1] The Honorable M. Joseph Donald, Milwaukee County Circuit Court, presided.

[2] Majority op., ¶1 (emphasis added).

1

fundamental Second Amendment right——in the sentencing judge's own worldview.

¶26 Instead of crafting an individualized sentence, the sentencing judge focused on how <u>lawful</u> firearm possession changes people, not on how Dodson <u>unlawfully</u> used his firearm. The sentencing judge reasoned: (1) when a person buys a gun and begins carrying it for self-defense, he is forever changed by the experience and starts to see the world as a threat; (2) therefore, all gun owners are a danger to society——not just felons who unlawfully use firearms; and (3) Dodson should be behind bars for a particularly long time because he, like all other gun owners, has a "distorted, misguided belief of the world," which causes him to perceive non-existent threats.

¶27 Dodson's punishment was increased "<u>solely</u>" because he "availed himself" of a constitutional right. <u>See</u> <u>State v. Williams</u>, 2018 WI 59, ¶22, 381 Wis. 2d 661, 912 N.W.2d 373 (quoting <u>Buckner v. State</u>, 56 Wis. 2d 539, 550, 202 N.W.2d 406 (1972)). His status as a lawful gun owner was irrelevant, and its consideration was improper. Lawful gun ownership says nothing about a person's character or propensity for violence. Because the majority sanctions punishing lawful gun owners for exercising the fundamental constitutional right to keep and bear arms, I dissent.

I. SELF-DEFENSE, GUN OWNERSHIP, & VIRTUOUS CITIZENSHIP

[L]aw-abiding citizens who arm themselves are exhibiting the moral temper appropriate to a free people. They do not regard their lives and safety as a gift from the government. Nor do they think they should wait for the

2

government to come along and save them when their lives
or the lives of other innocent people are threatened.

Nelson Lund, The Right to Arms and the American Philosophy of Freedom, First Principles, Oct. 17, 2016, at 1, 18.

¶28 Every person has a natural right to defend himself, which is protected by both the Second Amendment to the United States Constitution as well as Article I, Sections 1 and 25 of the Wisconsin Constitution. People are born with this right, and the government may not infringe it. See Porter v. State, 2018 WI 79, ¶52, 382 Wis. 2d 697, 913 N.W.2d 842 (Rebecca Grassl Bradley & Kelly, JJ., dissenting). "[People] should have a right to destroy that which threatens [them] with destruction: for, by the fundamental law of nature, man being to be preserved as much as possible, when all cannot be preserved, the safety of the innocent is to be preferred[.]" John Locke, Second Treatise of Government § 16 (1690). Indeed, "self defence is nature's eldest law." John Dryden, Absalom and Achitophel, as reprinted in 9 The Works of John Dryden, at 217, 231 (1808).

¶29 Millions of Americans, including hundreds of thousands of Wisconsinites, keep and bear arms in exercising their natural right to self-defense. See Christopher J. Schmidt, An International Human Right to Keep and Bear Arms, 15 Wm. & Mary Bill Rts. J. 983, 994 (2007) ("The Framers believed individual self-defense was an inalienable natural right. . . . The right to keep and bear arms was a by-product of the natural right to self-defense and survival. . . . Consequently, the right to keep and bear arms was also described as a natural right that does not belong to the government but to the individual."). Although Dodson

3

admittedly committed a crime by using unnecessary defensive force, his lawful gun ownership and possession had no bearing on his culpability or character.

¶30 Wisconsin's concealed carry law reflects a legislative recognition that lawfully purchasing and carrying a firearm is completely consistent with responsible citizenship. See generally C'Zar Bernstein, Timothy Hsiao & Matt Palumbo, The Moral Right to Keep and Bear Firearms, 29 Pub. Aff. Q. 345 (2015). As the Framers understood, "an individual's ability to arm himself against threats to his person, property, or . . . the State" is "[t]he cornerstone of strength of a republican society[.]" Schmidt, An International Human Right to Keep and Bear Arms, at 994. As a matter of law, law-abiding citizens have a constitutionally-protected right to possess firearms and the government may not punish them for exercising it.

¶31 Both the United States Constitution and the Wisconsin Constitution protect the individual right to keep and bear arms. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." As particularly relevant in this case, the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." District of Columbia v. Heller, 554 U.S. 570, 592 (2008). This individual right is incorporated against the states by the Fourteenth Amendment. McDonald v. City of Chicago, 561 U.S. 742, 750, 791 (2010).

4

¶32 Article I, Section 25 of the Wisconsin Constitution states: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." We recently described this provision as "a straightforward declaration of an individual right to keep and bear arms for any lawful purpose[,]" including "obtaining a license to carry concealed weapons."[3] Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶¶10-11, 373 Wis. 2d 543, 892 N.W.2d 233. Among other lawful purposes, the Framers of Section 25 enumerated both "security" and "defense" as functions which animated the people's decision to protect the right to keep and bear arms.

¶33 American citizens have a long history and tradition of keeping and bearing arms in case of confrontation. The right to do so antedates the establishment of government at any level. Both our federal and state constitutions preserve this most fundamental and natural right from infringement by the government. Citizens may not be punished for lawfully exercising it.

## II. BACKGROUND

### A. Octavia Dodson & His Crime

¶34 As acknowledged by the sentencing judge, Dodson was a model citizen before committing this crime.[4] A hard-working employee and a good father, Dodson had no criminal history.[5] Like

---

[3] The majority does not address Article I, Section 25 of the Wisconsin Constitution even though Dodson raised it. Dodson's Br. at 16.

[4] R. 73:32.

[5] R. 17:9-12; R. 73:32.

5

millions of other model citizens, Dodson chose to keep and bear arms. In 2014, he became a concealed carry permit-holder after completing all state-mandated training.[6] In the sentencing judge's personal view, Dodson's decision to purchase and carry a firearm somehow impaired his virtue, an opinion utterly antithetical to founding principles underlying the explicit constitutional protection afforded the natural right to keep and bear arms.

¶35 The sentencing judge would have us believe that each day Dodson exercised his right to keep and bear arms, he menaced society. For the sentencing judge, Dodson's lawful, constitutionally-protected conduct <u>before</u> the crime overshadowed the crime itself. With no grounding in reality, the sentencing judge hypothesized that gun owners possess an increased propensity for violence triggered by a purportedly paranoid worldview, clouded by misperceptions of non-existent threats. In applying his own "distorted" views of gun owners in this case, the sentencing judge impermissibly stereotyped Dodson.

¶36 In March 2016, Dodson, a Black man, was the victim of a hit and run.[7] The driver of a Buick rear-ended him and then drove away. Dodson tried to follow the fleeing Buick, but he lost sight of it. Minutes after the collision, Dodson spotted Deshun Freeman's Buick, which, contrary to Dodson's belief at the time, probably was not the Buick involved in the hit and run. After Dodson followed Freeman's Buick, Freeman pulled over and exited

---

[6] R. 1:4. The state requires extensive training. <u>See</u> Wis. Stat. § 175.60(4)(a) (2013-14).

[7] R. 1:3 & n.2.

his vehicle. As the majority notes, the two men were standing only "about two car-lengths" away.[8] Freeman moved toward Dodson, yelling racial epithets.[9] Mistakenly thinking Freeman was armed, Dodson shot Freeman multiple times with a handgun, which he was lawfully carrying as a concealed carry permit-holder. Freeman died. A few hours later, Dodson surrendered himself to the police.

¶37 For apparent dramatic effect, the majority emphasizes that Dodson "swapped out his pistol's ten-round magazine for an extended 17-round magazine" as he was searching for the Buick.[10] So what? The sentencing judge did not even mention this irrelevant fact, but merely noted Dodson purchased an extended magazine, without discussing how Dodson used it.[11] The conflation of lawful purchase and possession with unlawful use is the central problem with the sentencing judge's remarks (and the majority's approval of them).

¶38 No one has suggested the magazine was atypical, much less illegal. To the contrary, such magazines are "fairly ordinary" and "popular." See Miller v. Bonta, __ F. Supp. 3d __, 2021 WL 2284132 *1 (S.D. Cal.), appeal filed ("Like the Swiss Army Knife, the popular AR-15 rifle is a perfect combination of home

---

[8] Majority op., ¶3.

[9] The majority fails to mention Dodson is a Black man and merely says Freeman yelled an "obscenity[.]" Id., ¶4. The majority employs euphemisms. Understanding why Dodson may have perceived a threat—even if one did not, in fact, exist—is critical to understanding his actual culpability.

[10] Id., ¶3; see also id., ¶15.

[11] R. 73:30-31.

7

defense weapon and homeland defense equipment. . . . This case is not about extraordinary weapons lying at the outer limits of Second Amendment protection. The banned 'assault weapons' are not bazookas, howitzers, or machineguns. Those arms are dangerous and solely useful for military purposes. Instead, the firearms deemed 'assault weapons' are fairly ordinary, popular, modern rifles.").

¶39 More fundamentally, even if there were something unusual about a 17-round magazine, it would have no bearing on this case. Would Dodson be less culpable in the majority's view if he had used a ten-round magazine instead? The majority doesn't say. Perhaps it deems a ten-round magazine less scary. Regardless of the majority's feelings toward guns, our constitutions do not countenance Wisconsinites being punished more harshly for lawfully carrying weapons a judge deems insufficiently mundane.

¶40 The State charged Dodson with second-degree intentional homicide by unnecessary defensive force and sought a penalty enhancer for use of a dangerous weapon. The penalty enhancer related to Dodson's use of the firearm, and had nothing to do with the extended magazine. Dodson pled guilty in exchange for the State dismissing the penalty enhancer and agreeing to seek a "substantial prison term" rather than a specific sentence.[12]

¶41 The majority fails to mention the presentence writer recommended a sentence of five to nine years of initial confinement followed by five to six years of extended supervision——

---

[12] R. 70:2–3; see also R. 13:2.

8

substantially less than the sentence Dodson received.[13]  The presentence writer noted, "Mr. Dodson expressed sincere remorse for his behavior, and was tearful in expressing his desire to go back in time."[14]  The presentence writer emphasized the incident happened "[i]n the flash of a second" and seemed to believe Dodson was in fear for his life.[15]

### B.  The Sentencing Hearing

¶42  At the sentencing hearing, the State expressed grave concern about America's gun laws——"critical context"[16] also noticeably left unmentioned by the majority.  This context informs the sentencing judge's remarks.  See United States v. Lemon, 723 F.2d 922, 931–32 (D.C. Cir. 1983).  In particular, the prosecutor's anti-gun sermon influenced the judge's reasoning for the sentence he imposed on Dodson.  The State claimed:

> I think that given the way our laws are now, a law-abiding citizen who's not otherwise prohibited can exercise the right to keep and bear [arms] on the Second

---

[13] R. 17:20.  We often refer to the presentence investigation for context.  See, e.g., State ex rel. Wren v. Richardson, 2019 WI 110, ¶4, 389 Wis. 2d 516, 936 N.W.2d 587 ("In early 2006, 15-year-old Joshua Wren shot and killed a man.  He pled guilty to first-degree reckless homicide, and in March 2007 was sentenced to 21 years of initial confinement and nine years of extended supervision——considerably more than Wren's counsel suggested and longer than was recommended in the presentence investigation report (PSI).").  The majority conspicuously omits any summary of the PSI.

[14] R. 17:19.

[15] R. 17:19.

[16] The majority accuses Dodson of "ignor[ing] critical context[,]" majority op., ¶12, while giving the reader only a selective and truncated version of the facts.

9

Amendment and the State can't prohibit the carrying of deadly force concealed on one's person because we have just decided as a people, that that is not a reasonable restriction on the time, place, and manner on the exercise of that inalienable right, and that's our law. That's where we are as a society. But the public does still have a right to be protected from people who think that this is some sort of a game, or that this is not real, or that this is a movie or a video. And that we can carry around these pieces of technology, which are capable of taking away a human life in a nano second. These are semiautomatic weapons. They are going to fire just as fast as a person who can pull the trigger. In [sic] a 17-round capacity is meant for nothing, nothing more than killing as quickly and efficiently as one possibly can.

. . . .

It's just, we just as a society, as a community, we just cannot look the other way and chalk this kind of carnage up to our CCW laws or our self-defense laws, or our castle doctrines, or whatever we have got these days that are condoning deadly force.[17]

The prosecutor's hyperbolic comments stand in contrast to the record, nothing in which indicates Dodson considered himself a character in a "movie or a video."

¶43 Betraying his derision for the people's fundamental right to keep and bear arms, the prosecutor complained that laws protecting the people's exercise of their natural right to self-defense "condon[e] deadly force."[18] Dodson admittedly used unnecessary defensive force; therefore, he could not claim self-defense. However, he did nothing wrong by lawfully carrying a firearm in case of confrontation. The prosecutor, by attacking CCW, self-defense, and the castle doctrine, conflated Dodson's

---

[17] R. 73:18-20.

[18] R. 73:19-20.

10

unlawful use of force with his lawful decision to purchase and carry a firearm.

¶44 To "condone" means to "[f]orgive or overlook (an offence; freq. a spouse's adultery)" or to "[a]pprove, sanction, esp. reluctantly[.]" Condone, Shorter Oxford English Dictionary (6th ed. 2007); see also Condone, Black's Law Dictionary (11th ed. 2019) ("To voluntarily pardon or overlook (esp. an act of adultery)."). It can also mean to "permit the continuance of (as vice, gambling)[.]" Condone, Webster's Third New International Dictionary (2002). Contrary to the State's moralistic disparagement of the people's fundamental constitutional rights, self-defense serves as a "justification" for an otherwise criminal act, not an "excuse." An act done in self-defense is not merely tolerated by the law——it is declared rightful. Marcia Baron, Justifications and Excuses, 2 Ohio St. J. Crim. L. 387, 388–90 (2005). Compare Justification, Black's Law Dictionary ("A lawful or sufficient reason for one's acts or omissions; any fact that prevents an act from being wrongful."), with Excuse, Black's Law Dictionary ("A defense that arises because the defendant is not blameworthy for having acted in a way that would otherwise be criminal. • The following defenses are the traditional excuses: duress, entrapment, infancy, insanity, and involuntary intoxication."). The prosecutor's comments relegated self-defense to an excuse, on par with insanity. See Baron, Justifications and Excuses, at 388–89 ("Insanity is an excuse; self-defense is a justification."). By extension, the prosecutor's comments also

11

called into question the character of lawful gun owners who exercise their right to self-defense.

¶45 Such a belittling attitude toward fundamental laws by a lawyer sworn to uphold them is disconcerting. The right to keep and bear arms may be listed second in the Bill of Rights, but "[t]he Second Amendment is neither second class, nor second rate, nor second tier." Mance, 896 F.3d at 396 (Willett, J., dissenting from a denial of a rehearing en banc). The prosecutor's hostility toward CCW, self-defense, and the castle doctrine set the tone for the rest of the sentencing hearing, conveying a sentiment ultimately adopted by the sentencing judge. At the outset of his remarks, the sentencing judge identified relevant sentencing factors but then acknowledged the prosecutor's diatribe was intended "almost in a sense to demonize the defendant in such a way that the Court truly understands what's at stake."[19] The sentencing judge then moralized about how gun ownership "changes" people:

> In reviewing this case, I have to say I am completely baffled as to why this happened. And I don't think that there is any rational way of trying to explain it. I can tell you this, Mr. Dodson, that in my experience as a judge, I have seen over time how individuals when they are possessing a firearm, how that in some way changes them. It changes how they view the world. It changes how they react and respond to people. I know that this is only speculation on my part, but I do strongly feel that the day that you applied for that concealed carry permit and went out and purchased that firearm, and that extended magazine, whether your rational beliefs for possessing it, whether you felt the need to somehow arm yourself and protect yourself from essentially the crime

---

[19] R. 73:30.

12

> that is going on in this community I think on that day set in motion this circumstance.
>
> It is clear to me, Mr. Dodson, that for whatever reason, and it appears that it is a distorted, misguided belief of the world that somehow Mr. Freeman was a threat that required you, in essence, to terminate his life. Makes no sense.[20]

No other portion of the sentencing judge's remarks were as long as his speech about the malefactions of lawful gun owners. Contrary to the majority's view, the sentencing judge did much more than make an off the cuff remark that <u>could</u> be construed to express a bias against gun owners; the judge's remarks bristled with animus toward them.

¶46 The sentencing judge then turned to Dodson's driving habits on the night in question, stating "[t]here is that <u>factor, too</u>, that I struggle with as to why Mr. Freeman pulled over and got out of his car."[21] By using the language "factor, too" in transitioning away from his criticisms of gun ownership, the sentencing judge made clear he considered gun ownership as a factor in sentencing Dodson. Our constitutions prohibit this.

¶47 The sentencing judge then discussed victim impact statements, Dodson's character, accomplishments, and acceptance of responsibility, and statements Dodson made to law enforcement that were not factually supported. He reiterated his belief that Dodson was "operating under some misguided belief, some distorted view <u>of the world</u> that somehow Desh[u]n Freeman was a threat[.]"[22] Notably,

---

[20] R. 73:30-31.

[21] R. 73:31 (emphasis added).

[22] R. 73:32 (emphasis added).

13

the sentencing judge did not merely say Dodson had a "distorted view" that Freeman was a threat——he said Dodson had a "distorted view of the world[.]" This generalized statement strongly indicates the sentencing judge inferred character traits from Dodson's lawful gun ownership.

¶48 Given the majority's fast and loose description of the sentencing hearing, it is necessary to discuss what the sentencing judge did not say. The sentencing judge's remarks were brief. Absent from them is any discussion of why Dodson might have been fearful. In fact, the sentencing judge barely discussed Dodson's actions on the night of his crime. When the sentencing judge did so, he focused primarily on Dodson's ostensibly aggressive driving. The sentencing judge said: "I struggle with as to why Mr. Freeman pulled over and got out of his car. And the only rationale that I can surmise, is that there was something about how you were operating your vehicle at that time that at least attracted his attention to you."[23]

¶49 The majority also mistakenly claims the sentencing judge "properly cabined" his remarks about gun owners to "some criminal defendants[.]"[24] In the majority's recasting of the hearing, the sentencing judge was not speaking about gun owners generally——just violent felons. The record proves the falsity of the majority's reconstruction of the hearing. The sentencing judge actually said: "I have seen over time how individuals when they are possessing a firearm, how that in some way changes them. It changes how they

---

[23] R. 73:31.

[24] Majority op., ¶15.

14

view the world."[25] The sentencing judge referred to "individuals," not "some criminal defendants," and lest there be any doubt about what he meant, moments later he also said, "I do strongly feel that the day that you applied for that concealed carry permit and went out and purchased that firearm . . . set in motion this circumstance."[26] Of course, when Dodson <u>lawfully</u> purchased a firearm, he was a <u>lawful</u> gun owner, not a felon or misdemeanant in the criminal justice system.

¶50 The sentencing judge sentenced Dodson to fourteen years of initial confinement followed by six years of extended supervision, for a total of twenty years imprisonment.[27] In announcing the sentence, he mentioned twice that Dodson was forever prohibited from possessing a firearm.[28] Dodson filed a postconviction motion for resentencing, which was heard by a different judge.[29]

---

[25] R. 73:30 (emphasis added).

[26] R. 73:30-31.

[27] R. 73:34.

[28] R. 73:33, 35 ("You are not to own or possess any firearms. . . . One other thing I forgot. Mr. Dodson, you are a convicted felon. From this time forward you may not own or possess a firearm. If you do so, you can be charged and prosecuted as a felon in possession of a firearm.").

[29] The Honorable Carolina Stark, Milwaukee County Circuit Court, presided.

15

C. The Postconviction Proceedings & Appeal

¶51 The postconviction judge denied the motion.[30] Critically, however, she found the sentencing judge's comments on gun ownership were not merely passing remarks but reflected his reasons for imposing the sentence. Specifically, the postconviction judge stated:

> [W]hen I look at them [the comments of the sentencing judge] there in the context of what he said, I do think that he was relying on [them]. So the reliance prong of this analysis I think is satisfied.
>
> I think he was relying on the things that he said were factors or things that he was announcing as part of his thought process he was relying on them.[31]

Nevertheless, the postconviction judge concluded, "the types of statements . . . the defendant has raised as evidence of an improper sentencing factor . . . are not improper sentencing factors when you look at them and look at them in the context of what [the sentencing judge] was saying."[32] The postconviction judge seemed to reason that, while perhaps a person's status as a gun owner and permit holder could be an improper factor, as applied in this case, they were not. The majority discards the postconviction judge's finding of actual reliance even though we generally give such findings some weight——at least when the

---

[30] Dodson's motion also requested plea withdrawal, alleging ineffective assistance of counsel. This appeal, however, concerns only his request for resentencing. See State v. Dodson, No. 2018AP1476-CR, unpublished slip op., ¶9 (Wis. Ct. App. Aug. 25, 2020) (per curiam).

[31] R. 72:25.

[32] R. 72:25.

16

postconviction judge is different than the sentencing judge. See State v. Alexander, 2015 WI 6, ¶34, 360 Wis. 2d 292, 858 N.W.2d 662.

¶52 Dodson appealed. The court of appeals affirmed. State v. Dodson, No. 2018AP1476-CR, unpublished slip op. (Wis. Ct. App. Aug. 25, 2020) (per curiam). It assumed "it would be improper to punish a defendant for legally exercising his or her right to bear arms under the United States and Wisconsin Constitutions." Id., ¶13. It concluded, however, the sentencing judge did not actually rely on Dodson's status as a gun owner and concealed carry permit-holder. Id., ¶16. It stated, "the trial court's comments indicate that it, like the parties, was trying to make sense of what appeared to be a senseless homicide[.]" Id. We granted Dodson's petition for review.

### III. STANDARD OF REVIEW

¶53 Generally, we review a circuit court's sentencing determination for an erroneous exercise of discretion. State v. Gayton, 2016 WI 58, ¶19, 370 Wis. 2d 264, 882 N.W.2d 459 (citing State v. Gallion, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197). "In exercising discretion, sentencing courts must individualize the sentence to the defendant based on the facts of the case by identifying the most relevant factors and explaining how the sentence imposed furthers the sentencing objectives." State v. Harris, 2010 WI 79, ¶29, 326 Wis. 2d 685, 786 N.W.2d 409 (citing Gallion, 270 Wis. 2d 535, ¶¶39-48). "Individualized sentencing . . . has long been a cornerstone to Wisconsin's criminal justice jurisprudence." Gallion, 270 Wis. 2d 535, ¶48;

17

see also In re Judicial Admin. Felony Sentencing Guidelines, 120 Wis. 2d 198, 202, 353 N.W.2d 793 (1984) (per curiam).

¶54 A circuit court erroneously exercises its discretion if it misapplies the law by relying on a "clearly irrelevant or improper factor[]" in determining a sentence. State v. Pico, 2018 WI 66, ¶48, 382 Wis. 2d 273, 914 N.W.2d 95 (quoting Harris, 326 Wis. 2d 685, ¶30); see also State v. Loomis, 2016 WI 68, ¶31, 371 Wis. 2d 235, 881 N.W.2d 749 (citing McCleary v. State, 49 Wis. 2d 263, 278, 182 N.W.2d 512 (1971)). Whether a circuit court relied on particular statements made at sentencing is a question of fact, which the defendant bears the burden of proving by clear and convincing evidence. See Alexander, 360 Wis. 2d 292, ¶17 (citations omitted). In this case, the only evidence of reliance is a transcript of the sentencing hearing. Therefore, we independently determine whether the sentencing judge relied on his statements about guns and gun owners, although we benefit from the postconviction judge's findings. State v. Travis, 2013 WI 38, ¶48, 347 Wis. 2d 142, 832 N.W.2d 491; Alexander, 360 Wis. 2d 292, ¶34. Whether a factor is irrelevant or improper presents a question of law we also review independently. See Loomis, 371 Wis. 2d 235, ¶29 (citing Jackson v. Buchler, 2010 WI 135, ¶39, 330 Wis. 2d 279, 793 N.W.2d 826).

## IV. APPLICATION

### A. Actual Reliance

¶55 As the postconviction judge recognized, the sentencing judge actually relied on Dodson's status as a gun owner and concealed carry permit-holder. Actual reliance is established if

18

the sentencing judge gave "explicit attention" to Dodson's status such that his status "formed part of the basis for the sentence." See Alexander, 360 Wis. 2d 292, ¶25 (quoting State v. Tiepelman, 2006 WI 66, ¶14, 291 Wis. 2d 179, 717 N.W.2d 1; Travis, 347 Wis. 2d 142, ¶¶28, 31). Dodson's exercise of his constitutionally-protected right to keep and bear arms not only "formed part of the basis for the sentence," it was central to the imposition of a sentence considerably harsher than the PSI writer's recommendation.

¶56 The sentencing judge began his remarks by noting relevant and proper factors he was supposed to consider. Before he discussed any of them, however, he suggested that the State's argument was intended to "demonize" Dodson to ensure the judge understood "what's at stake."[33] The sentencing judge did not say explicitly what he thought was "at stake;" however, immediately following this comment he spoke at length about gun ownership and how it "changes" people. He claimed he "ha[d] seen over time how individuals when they are possessing a firearm, how that in some way changes them. It changes how they view the world. It changes how they react and respond to people."[34] The judge did not refer to Dodson's particular circumstances but instead categorically grouped him with gun owners as a whole.

¶57 The sentencing judge then stated:

I know that this is only speculation on my part, but I do strongly feel that the day that you applied for that

---

[33] R. 73:30.

[34] R. 73:30 (emphasis added).

19

concealed carry permit and went out and purchased that firearm, and that extended magazine, whether your rational beliefs for possessing it, whether you felt the need to somehow arm yourself and protect yourself from essentially the crime that is going on in this community I think on that day set in motion this circumstance.[35]

This comment reveals the sentencing judge speculated that Dodson's lawful decision to keep and bear arms changed his worldview and "set in motion" a series of events culminating in his unlawful behavior. Given the temporal proximity of this comment to the sentencing judge's statement that gun ownership changes people, the judge made clear he stereotyped Dodson by finding him——like gun owners generally——forever changed for the worse by carrying a gun. The temporal proximity is dispositive to the analysis the majority should have employed; we are, after all, required to view sentencing statements in context, not in isolation. Id., ¶30 (citing Harris, 326 Wis. 2d 685, ¶45).

¶58 The sentencing judge solidified his reliance with his very next statement. He claimed this tragedy was likely caused by Dodson's "distorted, misguided belief of the world that somehow Mr. Freeman was a threat[.]"[36] Notably, the sentencing judge made a similar comment toward the close of his remarks, after discussing other factors everyone agrees he considered.[37] Critically, the sentencing judge did not claim that Dodson had a "distorted, misguided belief" that Freeman was a threat; he claimed that Dodson

---

[35] R. 73:30-31 (emphasis added).

[36] R. 73:31 (emphasis added).

[37] R. 73:32.

20

had a "distorted, misguided belief of the world" that caused him to wrongly perceive Freeman as a threat.[38]

¶59 Although Dodson, by pleading guilty, admitted that he acted unreasonably, the sentencing judge did not articulate a legitimate basis for finding that Dodson's unreasonable behavior stemmed from a paranoid worldview. This finding was based primarily on the sentencing judge's biased——and admittedly speculative——opinion that gun owners generally view the world as a threat. Importantly, the judge felt "strongly" about his subjective opinions——a point he felt compelled to articulate at sentencing.[39] In conveying those opinions, the sentencing judge paid "explicit attention" to Dodson's status as a gun owner and concealed carry permit-holder. See id., ¶25.

¶60 Immediately after a lengthy discussion of gun ownership, the sentencing judge said, "[t]here is that factor, too, . . . as

---

[38] The majority does not dispute this point. It says:

> The circuit court explained that in its "experience as a judge," it observed a recurring pattern wherein "possessing a firearm" changes how some criminal defendants "view the world" and "react and respond to people." From the circuit court's standpoint that pattern was apparent here: Dodson reacted unreasonably to Freeman because Dodson was armed with a gun. That is, absent the gun, Dodson would not have used lethal force. But Dodson did have the gun and a "distorted, misguided belief of the world that somehow Mr. Freeman was a threat," which as Freeman's murder tragically demonstrates, created a danger to the community——another proper sentencing consideration.

Majority op., ¶14 (citing Wis. Stat. § 973.017(2)(ad)).

[39] R. 73:30.

21

to why Mr. Freeman pulled over and got out of his car."[40] The use of the phrase "factor, too" shows that the immediately preceding discussion was more than a passing remark. The use of that phrase indicates Dodson's status as a gun owner and permit holder was a factor on at least equal footing with Dodson's debatably belligerent driving. Accordingly, not only did the sentencing judge pay explicit attention to Dodson's status as a lawful gun owner and concealed carry permit-holder, it "formed part of the basis for his sentence." Id.

¶61 The prosecutor's comments, which have already been discussed in detail, provide further context indicating the sentencing judge actually relied on Dodson's constitutionally-protected status. See Lemon, 723 F.2d at 931-32. The sentencing judge even acknowledged the prosecutor's argument was intended to ensure he understood what was "at stake."[41] The full transcript of the sentencing hearing confirms the sentencing judge was responding to an argument advanced by the prosecutor——and generally signaling his agreement.

¶62 Actual reliance is supported by the length of the gun ownership discussion in proportion to the sentencing judge's remarks as a whole. Nothing else was discussed to the same extent. The postconviction judge's findings substantiate this analysis. See Alexander, 360 Wis. 2d 292, ¶34. Although she interpreted the sentencing judge's remarks differently, the postconviction judge

---

[40] R. 73:31 (emphasis added).

[41] R. 73:30.

22

found the comments actually constituted part of the basis for the sentence.[42]

¶63 The majority nevertheless declares "Dodson . . . fail[ed] to prove by clear and convincing evidence that the circuit court improperly relied on his Second Amendment activities when it speculated that 'the day' Dodson obtained his gun, extended magazine, and CCW permit 'set in motion' the homicide."[43] The majority's argument relies heavily on magic words. Apparently, because the sentencing judge said he was "only speculat[ing]" about what caused Dodson to shoot Freeman, his remarks are insulated from scrutiny.[44] Magic words cannot save an unlawful sentence. See State v. Morgan-Owens, No. 2008AP887-CR, unpublished slip op., ¶33 (Wis. Ct. App. Dec. 16, 2008) (Kessler, J., dissenting) ("Although the trial court indicated that the pregnancy would 'not enter into this Court's decision-making in this case,' I am not convinced that the pregnancy did not negatively impact the sentence. These were not passing references to the pregnancy. On the contrary, the remarks indicate that the court was highly focused on the fact that Morgan-Owens became pregnant . . . . The totality of the trial court's comments show the court believed that Morgan-Owens intentionally became pregnant in order to positively influence the court at sentencing, and that it considered the pregnancy in a negative context at sentencing.").

---

[42] R. 72:25.

[43] Majority op., ¶16.

[44] Id., ¶17.

23

¶64    It is not necessary for a sentencing judge to say "you will be punished for [exercising your constitutional right] today" or "[exercising that right is] going to result in a higher sentence for you."[45]    Although the majority professes it is not requiring defendants to identify such an explicit statement, it fails to provide any other avenue for meeting the artificially high bar it sets in this case.  By effectively requiring a sentencing judge to admit wrongdoing, the majority impermissibly raises the burden of proof from clear and convincing evidence to beyond a reasonable doubt.

B.  Dodson's Gun Ownership:  An Irrelevant & Improper Factor

¶65 Dodson's status as a gun owner and concealed carry permit-holder was both an irrelevant and improper sentencing factor.  The sentencing judge increased Dodson's punishment because he exercised his constitutional right to keep and bear arms.  "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort[.]"  Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (citing North Carolina v. Pearce, 395 U.S. 711, 738 (1969) (Black, J., concurring/dissenting), overruled by Alabama v. Smith, 490 U.S. 794 (1989)).

¶66 Dodson's status was irrelevant because, as already explained, no reasonable inference whatsoever about a person's propensity for violence or his character in general can be drawn from lawful gun ownership.  In Dawson v. Delaware, the United

---

[45] Id. (quoting State v. Dalton, 2018 WI 85, ¶21, 383 Wis. 2d 147, 914 N.W.2d 120) (modifications in the majority).

24

States Supreme Court held the First and Fourteenth Amendments to the United States Constitution prohibited the introduction into evidence of a defendant's membership in the Aryan Brotherhood because his membership had "no relevance[.]" 503 U.S. 159, 160 (1992). Dawson's reasoning applies with particularly strong force in this case.

¶67 David Dawson was prosecuted in a capital case for a murder he committed after escaping prison. Id. at 160-61. While on the run, he broke into a home, killed a woman, and then stole her money and car before fleeing. Id. at 161. Dawson had stipulated that the Aryan Brotherhood was a prison gang that "entertains white racist beliefs[.]" Id. at 165. The murder victim was white. Id. at 166. The prosecutor never introduced any other evidence about the Aryan Brotherhood. Accordingly, the Court deemed Dawson's membership in that group an irrelevant sentencing factor.

¶68 If there had been evidence associating the Aryan Brotherhood with "violent escape attempts" or "murder," the Court declared it "would have [had] a much different case." Id. at 165. However, "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim." Id. at 166. "[T]he inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the . . . [Aryan Brotherhood]." Id. The evidence "was employed simply because the jury would find these beliefs morally reprehensible." Id. at 167. That violated Dawson's constitutionally-protected associational rights. Id.

25

¶69 Just as Dawson's membership in a hate group was an irrelevant sentencing factor, even more so was Dodson's status as a lawful gun owner and concealed carry permit-holder in this case. The prosecutor introduced no evidence about gun owners at all; he merely asserted, in conclusory fashion, that they are dangerous. While personal opinions about the desirability of gun ownership and possession may diverge greatly among members of the judiciary as much as among the citizenry, judges are duty-bound to apply the law and not their personal opinions in all cases before them. In upholding the rule of law, judges may punish people for committing crimes. They may not punish people for exercising constitutional rights judges may disfavor.

¶70 United States v. Lemon, a D.C. Circuit case, is also instructive. 723 F.2d 922. At sentencing, the prosecution argued the defendant, Edward Lemon, was a member of a "Black Hebrew sect" and that "his crime was part of a pattern of crimes committed for the benefit of the Black Hebrew community." Id. at 925. Despite Lemon's denial, the judge relied on the prosecution's assertions. Id. at 924, 931-32. The D.C. Circuit vacated and remanded for resentencing. It held: "A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid." Id. at 938 (emphasis added). Even if Lemon was a member, "mere membership," the court concluded, "would be an impermissible factor in sentencing." Id. at 940.

¶71 By analogy, a sentence based on activity protected by the Second Amendment is also constitutionally invalid. "Consideration of political beliefs, as distinguished from

26

criminal activity, would clearly be impermissible in determining defendants' sentences, because it would impair the rights of the defendants under the First Amendment, protecting public expression of their political beliefs, by words and symbols." United States v. Bangert, 645 F.2d 1297, 1308 (8th Cir. 1981) (citations omitted). While the sentencing judge could obviously consider Dodson's use of his gun to kill Freeman, consideration of Dodson's lawful ownership and possession of his gun during sentencing was clearly impermissible and violated Dodson's rights under the Second Amendment.

¶72 Factoring lawful gun ownership and possession into sentencing as a basis for increasing the defendant's punishment also implicates due process by assigning negative traits to all gun owners. We have recognized that "certain factors are improper for [a] circuit court to consider at sentencing and therefore violate a defendant's right to due process: race or national origin, gender, alleged extra-jurisdictional offenses, and the defendant's or victim's religion." Alexander, 360 Wis. 2d 292, ¶23. When constitutionally-protected factors such as race or religion are considered at sentencing, the chance that the defendant is impermissibly stereotyped——and thereby denied an individualized sentence——is high. See Harris, 326 Wis. 2d 685, ¶101 (Ann Walsh Bradley, J., concurring).

¶73 In this case, the sentencing judge pejoratively stereotyped all gun owners, thereby denying Dodson an individualized sentence while impermissibly punishing him not only for his crime but for his constitutionally-protected activity as

27

well. The sentencing judge's comments on gun ownership invoked "general predispositions" grounded in his experience, at the expense of the particulars of the case. See State v. Ogden, 199 Wis. 2d 566, 573, 544 N.W.2d 574 (1996). Tellingly, the sentencing judge never discussed Dodson's belief that his life was in danger, instead pronouncing in conclusory fashion that Dodson had a "distorted, misguided belief of the world[,]"[46] cultivated (in the judge's own worldview) by Dodson's decision to lawfully carry a concealed firearm. Absent from the sentencing judge's consideration was Dodson's side of the story——that he, a Black man, was approached by a man yelling racial slurs. In fact, the sentencing judge barely discussed Dodson's crime at all, instead impermissibly focusing on Dodson's exercise of his constitutionally-protected right to keep and bear arms as the predominate basis for the sentence imposed.

## V. CONCLUSION

¶74 The majority establishes a dangerous precedent, sanctioning the State's imposition of enhanced punishment based upon a defendant's exercise of a constitutionally-protected right. No one challenges the State's prerogative to punish criminals for the crimes they commit. Dodson pled guilty to a serious crime for which the law authorizes a penalty. The constitution, however, does not authorize punishment based in whole or in part on the defendant's constitutionally-protected conduct, no matter how inadvisable the judge may deem it.

---

[46] R. 73:31.

28

¶75 In this case, Dodson's punishment was impermissibly increased because he chose to exercise his right to keep and bear arms. Dodson's punishment should have been based solely on his unlawful use of a firearm, not his lawful ownership or possession of it. The majority's conflation of the two imperils the Second Amendment rights of Wisconsin citizens. I dissent.

¶76 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.