**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 8, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP222-CR**

Cir. Ct. No. **2015CF655**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TERRANCE P. SIMMONS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Terrance P. Simmons appeals from a judgment of conviction, entered pursuant to his no-contest plea, for multiple child sexual

offenses and from an order denying his postconviction motion. Simmons asserts that he is entitled to withdraw his pleas based on a deficient plea colloquy pursuant to *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), and the alleged constitutionally ineffective assistance of his defense counsel. In the alternative, Simmons seeks resentencing based on the circuit court's reliance on an improper factor at sentencing. For the reasons that follow, we affirm Simmons's judgment of conviction and the circuit court's denial of his postconviction motion.

## BACKGROUND

¶2      Simmons was charged with sexual crimes against children in three cases in three different counties. In the Marathon County case, which is the subject of this appeal, Simmons was charged by information with first-degree sexual assault of a child under age 12, repeated sexual assault of the same child, causing a child under age 13 to view or listen to sexual activity, and 3 counts of exposing a child to harmful materials. All counts carried the repeater enhancer. In Lincoln County Case No. 2016CF92, Simmons was charged with first-degree sexual assault of a child under age 13 by sexual contact, also as a repeater. In Dane County Case No. 2016CF1393, Simmons was charged with repeated sexual assault of the same child.

¶3      The child victims in all these cases—Mary, Linda, and Dana[1]—are all children of women with whom Simmons was in ongoing and concurrent

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use pseudonyms instead of the victims' names. In its brief, the State adopts pseudonyms for the child victims based on the counties in which Simmons sexually assaulted them: "Mary" for Marathon County; "Linda" for Lincoln County; and "Dana" for Dane County. We do so as well.

All references to the Wisconsin Statutes are to the 2023-24 version.

romantic relationships. At the time Simmons sexually assaulted the girls, Mary and Linda were three to five years old, and Dana was eight to nine years old. In each case, Simmons had mouth to vagina contact with the victims. In addition, Simmons forced Mary and Dana to perform oral sex on him, and he attempted to have vaginal sex with Dana.

¶4 In the Marathon County case, the State moved to admit Linda's and Dana's testimony as other-acts evidence at trial. According to the motions, the State offered the other-acts evidence to establish Simmons's motive and intent—that being, Simmons had sexual contact with Mary for the purpose of sexual arousal or gratification. After a nonevidentiary hearing, the circuit court admitted the evidence.

¶5 On the eve of trial, Simmons decided to resolve all of the cases by global plea agreement after the State threatened to additionally charge Simmons with intimidation of a witness and felony bail jumping.[2] As a result, Simmons pled no contest in the Marathon County case to an amended count of first-degree sexual assault of a child under age 13 based on sexual contact;[3] repeated sexual assault of the same child; causing a child under age 13 to view or listen to sexual activity; and 3 counts of exposing a child to harmful materials, all counts as a repeater. The Lincoln County and Dane County charges were dismissed and read in, and the State agreed not to charge Simmons with any additional crimes based

---

[2] These additional charges were based on recorded phone calls between Simmons, Mary's mother, and Dana's mother, which occurred while Simmons was in jail, where he encouraged Dana's mother not to bring Dana to testify at his trial.

[3] That amendment eliminated a twenty-five-year mandatory minimum sentence.

on the recorded phone calls, although the court was free to consider that conduct at sentencing.

¶6      Before entering his plea, Simmons completed a plea questionnaire and waiver of rights form with his attorney. The jury instructions for each offense were attached to the plea questionnaire. For each offense, Simmons circled and initialed each element to confirm that he reviewed them with his attorney. The jury instruction for first-degree sexual assault of a child referred to both "sexual intercourse" and "sexual contact," but the charge was based on "sexual contact" and the definition of that term was not attached to the plea questionnaire. At sentencing, when the circuit court asked Simmons whether he had any questions about the elements of any of his offenses, Simmons responded, "No," each time. However, the circuit court did not specifically discuss with Simmons the definitions of "sexual intercourse" or "sexual contact" during the colloquy.

¶7      The circuit court sentenced Simmons to a total of 44 years' incarceration, comprised of 24 years' initial confinement followed by 20 years' extended supervision. The court based its sentence on several factors, including Simmons's criminal history, the read-in offenses from Lincoln and Dane Counties, his "history of undesirable behavior patterns," his character traits, his poor work history, his failure to show remorse and accept responsibility, and the need to protect the public. According to the court, "[t]he only significant mitigating factor in this case is that you did not force those victims to testify at trial." The court described Simmons's offenses as "so disgusting and sick that to describe them as vicious or aggravated only undermines their severity."

¶8      Simmons subsequently filed a postconviction motion, seeking plea withdrawal or, in the alternative, resentencing. With respect to plea withdrawal,

he argued that his plea colloquy was defective pursuant to *Bangert* because he was not informed of the definition of "sexual contact" and, thus, did not have a sufficient understanding of the nature of the charge against him. Simmons also asserted that his pleas were involuntary due to the ineffective assistance of his defense counsel. Specifically, he alleged that counsel advised him that the charge of witness intimidation would mean that he forfeited his right to cross-examine any of the victims—i.e., the forfeiture by wrongdoing doctrine—and that counsel failed to consult with an expert witness to analyze Mary's forensic interview. Finally, Simmons alternatively asserted that he should be resentenced because "the [circuit court's] reliance on inaccurate and improper information relating to others' perceptions of his religious beliefs violated his Due Process Rights to be sentenced on proper and accurate information."

¶9      The circuit court held a three-day *Machner*[4] hearing on Simmons's motion. At the hearing, defense counsel, counsel in the Dane County case, a forensic interview expert, and Simmons testified. We discuss their testimony in further detail below.

¶10      Ultimately, the circuit court denied Simmons's motion to withdraw his pleas. First, and as relevant to this appeal, although the court determined that Simmons's plea colloquy was defective because the court had failed to confirm that Simmons understood the meaning of "sexual contact" within the charge of first-degree sexual assault of a child, it concluded that Simmons nevertheless entered a knowing, intelligent, and voluntary plea because the record demonstrated

---

[4] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

that Simmons was aware of the definition of "sexual contact" through the other-acts motions and the hearings in this case and in the Dane County case.

¶11 Second, the circuit court rejected Simmons's ineffective assistance of counsel argument based on the forfeiture by wrongdoing doctrine for a lack of deficient performance because it found that defense counsel's advice was accurate. Further, the court specifically found that Simmons's asserted lack of understanding was not credible. Third, the court denied Simmons's ineffective assistance of counsel argument pertaining to defense counsel's failure to consult with a forensic interview expert because it concluded that counsel had made a reasonable strategic decision to challenge the State's evidence through cross-examination rather than have the case "become about which expert the jury should believe more."

¶12 Finally, the circuit court denied Simmons's assertion that the court relied on his religion as an inaccurate and improper factor at sentencing. According to the court, it "never explicitly mentioned [Simmons's] religion," did not consider Simmons's religion when sentencing him, and relied solely on relevant sentencing factors. Simmons appeals.

## DISCUSSION

### I. *Bangert* violation

¶13 "When a defendant seeks to withdraw a guilty plea after sentencing, he [or she] must prove, by clear and convincing evidence, that a refusal to allow withdrawal of the plea would result in 'manifest injustice.'" *State v. Brown*, 2006 WI 100, ¶18, 293 Wis. 2d 594, 716 N.W.2d 906 (citation omitted). "One way for a defendant to meet this burden is to show that he [or she] did not knowingly,

intelligently, and voluntarily enter the plea." *Id.* Accordingly, if a guilty plea is not made knowingly, intelligently, and voluntarily, the defendant "is entitled to withdraw the plea as a matter of right because such a plea 'violates fundamental due process.'" *Id.*, ¶19 (citation omitted).

¶14 "Whether a plea is knowing, intelligent, and voluntary is a question of constitutional fact." *Id.* "We accept the circuit court's findings of historical and evidentiary facts unless they are clearly erroneous[,] but we determine independently whether those facts demonstrate that the defendant's plea was knowing, intelligent, and voluntary." *Id.*

¶15 In this case, Simmons challenges the knowing, intelligent, and voluntary nature of his plea by alleging a plea colloquy defect. *See id.*, ¶¶39-40. WISCONSIN STAT. § 971.08(1)(a) requires that the circuit court determine during a plea colloquy whether a plea "is made voluntarily with understanding of the nature of the charge." "To understand the nature of the charge, the defendant must be aware of all the essential elements of the crime." *State v. Jipson*, 2003 WI App 222, ¶9, 267 Wis. 2d 467, 671 N.W.2d 18. Simmons argues that the court conducted a defective colloquy by failing to apprise him of the meaning of "sexual contact" and that he did not understand that element of the crime he committed.[5] *See Bangert*, 131 Wis. 2d at 274; *Jipson*, 267 Wis. 2d 467, ¶¶9, 13 (noting that courts have crafted the purpose of the sexual contact to be an element of the offense of sexual assault of a child).

---

[5] As relevant here, sexual contact means the "intentional touching" of an intimate body part of the victim by the defendant, and it "also requires that the defendant acted with intent to become sexually aroused or gratified [or] sexually degrade or humiliate" the victim. WIS JI—CRIMINAL 2101A (2024) (formatting altered).

¶16     At the *Machner* hearing, Simmons's defense counsel admitted that he did not attach the jury instruction defining sexual contact to the plea questionnaire.  When asked if he had reviewed that instruction with Simmons, counsel stated, "I don't believe so, and the reason being is had I reviewed them with him, I would have attached them and submitted them with the Court."  Thus, according to Simmons, "[t]he record in this case contains no evidence that Simmons understood the legal definition of 'sexual contact'" because until the plea hearing, when the charge was amended orally, the charges in the Marathon County case referenced "sexual intercourse" and repeated "sexual assaults."  As Simmons explains, "[a]lthough the court confirmed that Simmons was pleading to charges involving 'sexual contact,' … the court did not define that term for Simmons, and the definition of sexual contact was not used during the plea hearing."  In particular, Simmons contends that "[t]he key question here is whether, at the time Simmons entered his pleas, he was aware that the State had to prove that his conduct was taken for the purposes of his sexual gratification or the victim's humiliation to establish 'sexual contact.'"[6]

¶17     Neither the circuit court nor the State on appeal dispute that Simmons has established that a *Bangert* violation occurred because Simmons was

---

[6] We note that the record is unclear if and why the charge of first-degree sexual assault of a child was amended to allege only sexual contact.  It is clear, however, that both parties agree that the charge was amended to include sexual contact, and Simmons does not allege that this amendment was erroneous based on the allegations in the complaint.  It is also clear that the specific allegation was "mouth to vagina" contact.  Thus, we will focus on the specific issue of whether Simmons understood the term "sexual contact," focusing specifically on whether Simmons understood that the State needed to prove that the contact alleged was for purposes of his sexual arousal or gratification.

not advised of the definition of "sexual contact" prior to entering his plea.[7] On this point, we also agree.

¶18 Nevertheless, we concur with the circuit court's conclusion that the defect in the plea colloquy did not render Simmons's plea unknowing, unintelligent, and involuntary. Here, evidence presented at the *Machner* hearing, when viewed collectively, demonstrated by clear and convincing evidence that Simmons was aware of and understood the definition of "sexual contact" as requiring the State to prove that his conduct was for the purpose of his sexual arousal or gratification or the victim's humiliation prior to entering his plea in this case. When addressing a *Bangert* violation, "[t]he State may utilize the entire record to demonstrate [a defendant's] knowledge of the nature of his [or her] offense and of the constitutional rights he [or she] was waiving." *State v. Bollig*, 2000 WI 6, ¶53, 232 Wis. 2d 561, 605 N.W.2d 199; *see also Brown*, 293 Wis. 2d 594, ¶40 (discussing the evidence available to the State).

¶19 First, the State's two other-acts motions in this case generally defined "sexual contact." Within both motions, the State explained, "At trial, the State must prove, in part, that [Simmons] intentionally had sexual contact with [Mary] and that he did so for purposes of sexual arousal or gratification." The other-acts motions were then litigated during a nonevidentiary hearing, at which Simmons appeared in person, where the parties generally discussed Simmons's

---

[7] "The duties established in WIS. STAT. § 971.08, in [*State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986)], and in subsequent cases are designed to ensure that a defendant's plea is knowing, intelligent, and voluntary." *State v. Taylor*, 2013 WI 34, ¶30, 347 Wis. 2d 30, 829 N.W.2d 482 (citation omitted). If a court fails to perform one of these duties, a "*Bangert* violation" occurs, and a defendant may be entitled to withdraw his or her plea unless the State can show by clear and convincing evidence that the plea was nonetheless knowing, voluntary, and intelligent. *Taylor*, 347 Wis. 2d 30, ¶32.

"intent and motive" for his crimes against Mary in relation to the other-acts evidence. Thus, the discussion in the other-acts motions and at the hearing put Simmons on notice that the State was required to prove Simmons's intent for committing the charged crimes, and we agree with the State that Simmons could not have reviewed the motion and left the hearing with "the impression that all physical contact with a young girl could be sexual contact."[8]

¶20 Second, the other-acts motion that the State filed in the Dane County case also defined "sexual contact." Although Simmons denied reading the motion, he did confirm that he discussed the motion with counsel. Furthermore, at the other-acts motion hearing in the Dane County case, the requirements to prove "sexual contact" were stated on the record while Simmons was in attendance. In particular, the discussion at the hearing advised Simmons that "the [S]tate has the burden of proving that the sexual contact between [Simmons] and [the victim] was intentional and for the purposes of sexual gratification." The State went on to

---

[8] Simmons challenges the circuit court's reliance on the other-acts motions as a source of his knowledge of the term "sexual contact," arguing that the motions were filed approximately two and one-half years before Simmons entered his pleas and that "[t]he issue was raised in a completely different context." We note, however, that Simmons fails to present any legal authority in support of his assertion, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and we conclude that the passage of time, standing alone, would not necessarily undermine the court's finding. As noted above, when considering this issue, the State may aggregate the record. *See State v. Bollig*, 2000 WI 6, ¶53, 232 Wis. 2d 561, 605 N.W.2d 199. As the State asserts, the court "could infer from Simmons's review of his plea questionnaire and his lack of questions in the colloquy that he did remember the definition…. One would not plausibly be expected to forget a definition that one claims is critical to one's defense."

Simmons also asserts that the circuit court erred by relying on the other-acts motions because "[t]he record contains zero evidence that Simmons actually read those other[-]acts motions" or that defense counsel definitely reviewed the motions with him. However, the State's burden is not so stringent. By finding that Simmons was actively involved in his defense, based on defense counsel's and Simmons's testimony, the court reasonably inferred that Simmons had learned of the definition of "sexual contact" from one of a number of sources within the record, including argument at the hearings on the State's other-acts motions during which he was present.

explain that the other-acts evidence "of [Simmons's] arousal and sexual contact with other children establishes that, as with this particular victim, he has a … sexual desire for other children. Particularly young girls." Also at that hearing, the State argued before the circuit court that the other-acts evidence was "necessary in this case to prove that the defendant intended to touch the victim, to have this contact" and to show that the contact was not "misconstrued or an accident or not for the purposes of sexual gratification."

¶21 Furthermore, defense counsel testified that Simmons "was very involved in his defense" and that counsel "had lengthy conversations with [Simmons], both over the phone and in person." Importantly, defense counsel confirmed that these conversations included the reports, discovery, and motions, including the other-acts motions. Simmons agreed he "thoroughly" "reviewed the materials in [his] case because it was [his] life on the line." Thus, based on this evidence, the circuit court did not clearly err by finding that Simmons was "actively involved" in his defense and was, therefore, aware of the information contained in the filings in his case and what occurred at the hearings.

¶22 Finally, as discussed above, Simmons circled and initialed each element of each charge on the jury instructions attached to the plea questionnaire, indicating that he reviewed that element. One of the elements of the first-degree sexual assault charge was as follows: "The defendant had sexual [contact] [intercourse] with (name of victim)." (Alterations in original.) When asked if he had any questions about the elements of the offenses, Simmons said no. While this fact, alone, would not constitute affirmative evidence of knowledge, it nevertheless is a fact to be considered when determining if Simmons's plea was made freely, voluntarily, and intelligently.

¶23 Neither the circuit court nor this court are required to outright accept Simmons's self-serving statement that he did not previously understand that the meaning of the term "sexual contact" required the State to prove that his conduct was for the purpose of his sexual gratification or the victim's humiliation. Given all of the above, the circuit court's findings of fact are not clearly erroneous. We therefore conclude that the State has met its burden to prove that Simmons understood the term "sexual contact," and Simmons's plea was knowing, intelligent, and voluntary.

## II. Ineffective assistance of counsel

¶24 Simmons next challenges the denial of his two ineffective assistance of counsel arguments. A defendant may seek plea withdrawal when some factor extrinsic to the plea colloquy, like ineffective assistance of counsel, renders a plea infirm. *See* ***State v. Bentley***, 201 Wis. 2d 303, 314, 548 N.W.2d 50 (1986); ***Nelson v. State***, 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972). To successfully bring an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." ***Id.*** at 690. "Courts afford great deference to trial counsel's conduct, presuming that it 'falls within the wide range of reasonable professional assistance.'" ***State v. Savage***, 2020 WI 93, ¶28, 395 Wis. 2d 1, 951 N.W.2d 838 (citation omitted). "Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." ***State v. Thiel***, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted).

¶25 Prejudice is demonstrated by showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the plea withdrawal context, there must be "a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *State v. Cooper*, 2019 WI 73, ¶32, 387 Wis. 2d 439, 929 N.W.2d 192 (citation omitted). We will not address both prongs of the *Strickland* test if a defendant fails to make a sufficient showing on one prong. *Strickland*, 466 U.S. at 697.

¶26 "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶27 Simmons argues that his defense counsel was ineffective in two ways. First, he contends that his defense counsel's failure to consult with an expert to analyze Mary's forensic interview constituted ineffective assistance of counsel. Second, he argues that his defense counsel provided erroneous advice regarding the forfeiture by wrongdoing doctrine, which resulted in him misunderstanding his constitutional rights. For the reasons that follow, we conclude that Simmons has failed to establish that his defense counsel performed deficiently.

### A. *Forensic interview expert*

¶28 According to Simmons, Mary's forensic interview was "a key piece of evidence the State intended to present at trial," and defense counsel "acknowledged that the forensic video … was a 'very important' piece of evidence for the State." Simmons asserts that his defense counsel erred by not consulting with a forensic interview expert prior to trial. He contends that "[e]ven strategic decisions can be found deficient when undermined by inadequate investigation, or when they are based on an erroneous understanding of the facts or law." He also contends that because defense counsel "had never consulted with a forensic psychologist to analyze one of these videos before," counsel erroneously "believed he would be able to question the forensic interviewer" on cross-examination. Further, Simmons retained an expert who testified at the ***Machner*** hearing, who generally "opined that [Mary's] interviewer did not follow best practices, as the majority of her question types were directive rather than open-ended, and that problematic question types can have 'significant implications on memory' of the child."

¶29 Defense counsel also testified at the ***Machner*** hearing regarding his reason for not consulting with a forensic interview expert. According to counsel, he "felt comfortable not having an expert" because the "plan" was to "accomplish effective questioning [of the forensic interviewer] on cross-examination" and draw out the alleged issues in Mary's forensic interview—i.e., concerns about the interviewer's specific questions, the timing delay of the forensic interview, outside influences impacting Mary's memory, and the interviewer's leading questions. Furthermore, Simmons's defense counsel explained that, based on his experience, "juries tend to not favor battles of experts where the State has an expert, the [d]efense has an expert and they're saying different things." Simmons's testimony

also confirmed that when he asked before trial about hiring an expert witness, counsel explained his position, noting that he "didn't want [the trial] to be about those expert witnesses."

¶30 Based on defense counsel's testimony, we conclude that the circuit court reasonably determined that counsel did not perform deficiently by not consulting with a forensic interview expert. The court found that defense counsel's decision not to retain an expert was "a strategic choice" and that the "decision to forego the retaining of an expert and instead use cross-examination of witnesses to discredit the disclosure of the child victim was reasonable." "[W]here a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Breitzman*, 378 Wis. 2d 431, ¶65 (citation omitted). We agree with the court that defense counsel's strategic decision not to retain a forensic interview expert was, under the circumstances, a reasonable strategic decision. *See State v. Mader*, 2023 WI App 35, ¶46, 408 Wis. 2d 632, 993 N.W.2d 761 ("[Counsel's] decision not to call an expert and instead to rely on cross-examination was not deficient performance."), *overruled on other grounds by State v. Molde*, 2025 WI 21, __ Wis. 2d __, 21 N.W.3d 343; *see also State v. Teynor*, 141 Wis. 2d 187, 212, 414 N.W.2d 76 (Ct. App. 1987) ("That counsel's trial strategy was unsuccessful does not mean his [or her] performance was legally insufficient."). Simmons has therefore failed to demonstrate that his defense counsel performed deficiently in this respect.

## B. Forfeiture by wrongdoing

¶31 Simmons next argues that the advice his defense counsel gave him regarding the forfeiture by wrongdoing doctrine was erroneous, and as a result,

Simmons did not understand the constitutional rights he was waiving when he entered his plea.[9] As noted previously, prior to trial, the State obtained recorded telephone calls from the jail between Simmons, Mary's mother, and Dana's mother, in which Simmons was essentially telling Dana's mother not to bring Dana to testify. Prior to these recordings being revealed, Simmons had planned to go to trial, but that plan changed as a result of the phone calls. Simmons's defense counsel believed that the content of those calls provided probable cause to charge Simmons with witness intimidation and provided "a good argument" under the forfeiture by wrongdoing doctrine for the State to play Dana's forensic interview in her absence.[10]

---

[9] We pause to note that Simmons initially appeared to raise this ineffective assistance argument as a **Bangert** claim. The State correctly responded that while defendants may generally bring either or both motions, Simmons cannot raise the ineffective assistance of counsel as a **Bangert** claim, which alleges some deficiency by the circuit court with regard to the plea colloquy. Instead, this is a **Nelson**/**Bentley** claim in which a defendant alleges that a factor *extrinsic* to the plea colloquy rendered his or her plea unknowing and involuntary. *See Nelson v. State*, 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972); **State v. Bentley**, 201 Wis. 2d 303, 314, 548 N.W.2d 50 (1986). In his reply brief, Simmons appears to agree with the State, as he asserts that he is making a stand-alone **Bentley** claim, but he argues that his claim is different from an ineffective assistance claim. We disagree with Simmons. Simmons is arguing that his plea was not knowing, intelligent, and voluntary based upon the inaccurate advice of his defense counsel. This is an ineffective assistance of counsel argument.

Simmons draws a comparison between this case and **State v. Riekkoff**, 112 Wis. 2d 119, 332 N.W.2d 744 (1983), to support his position. Simmons's reliance on **Riekkoff** is misplaced. **Riekkoff** involved the guilty plea waiver rule, and defense counsel, the prosecutor, and the circuit court all misrepresented the bounds of that rule to the defendant. **Id.** at 128. Thus, in **Riekkoff**, the error came from counsel but also came from an error in the plea colloquy. The factual circumstances in this case are materially different.

[10] "The forfeiture by wrongdoing doctrine is an exception to the Sixth Amendment's Confrontation Clause." **State v. Baldwin**, 2010 WI App 162, ¶34, 330 Wis. 2d 500, 794 N.W.2d 769. The doctrine permits the introduction of statements of a declarant who is detained or kept away by the defendant as a way to prevent the defendant from profiting from his or her own wrongdoing. **Id.**, ¶¶34-35.

¶32 According to Simmons, the advice his defense counsel provided to him was, "at best, ambiguous and incomplete," and his "erroneous understanding of that advice invalidated the knowing, voluntary, and intelligent nature of his pleas." Based on Simmons's testimony at the *Machner* hearing, defense counsel told him the following: (1) "[t]he State was going to charge him with intimidating a victim and a witness"; (2) "[t]he State would also charge [Mary's mother] for participating in the phone calls"; (3) "[t]hey would be charged with those crimes unless Simmons accepted a plea agreement; (4) "[i]f you intimidate a victim and a witness, then 'they don't have to show up' at trial"; and (5) "[a]s a result, at trial, the State would 'just play the forensic video,' and [defense counsel] 'cannot cross-examine the video.'"

¶33 Thus, Simmons asserts that he interpreted his counsel's advice as being that Mary *and* Dana would not need to come to trial, and because his defense counsel could not cross-examine a video, Simmons believed he had "no chance" at being found not guilty of the charges. Likewise, Simmons also testified that his defense counsel never told him that the witnesses were still legally required to come to the trial, despite the alleged intimidation, and that the State could not just tell the witnesses not to show up. According to Simmons, but for defense counsel's erroneous advice, he would not have entered a plea and would have insisted on going to trial.

¶34 Simmons's defense counsel testified at the *Machner* hearing that his understanding was that the forfeiture by wrongdoing doctrine would apply only to Dana, and, therefore, he "would not have affirmatively advised" Simmons that it applied to Mary. However, counsel agreed that he "probably" advised Simmons that the "State could just use the video" and told him "I can't cross-examine a video." Counsel also agreed that he may have advised Simmons that the

17

intimidation issue "ruined his defense." Finally, counsel acknowledged that "I don't know that I would have made it explicitly clear that they still were under subpoena and that they still had to show up."

¶35 The circuit court rejected Simmons's ineffective assistance of counsel argument. Specifically, the court explained that defense counsel's advice "was not inaccurate"; that "[n]othing in the record suggests Simmons ever questioned or asked his attorney to clarify the impact of that intimidation information"; that it considered Simmons's "level of sophistication and involvement in his cases"; that it advised Simmons at the plea hearing that he was waiving his right to subpoena witnesses, and Simmons did not question that fact; that an "attempt to prevent a witness from appearing in court is, as noted by the State, consistent with consciousness of guilt"; and that it found Simmons's professed lack of understanding to be not credible.

¶36 We conclude that the circuit court correctly determined that counsel did not perform deficiently by providing Simmons with erroneous advice regarding the forfeiture by wrongdoing doctrine. First, the court specifically found Simmons's testimony to be not credible. The circuit court, as fact finder, is the ultimate arbiter of the credibility of witnesses and the weight to be given to their testimony. *See Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979) ("[W]hen the [circuit court] acts as the finder of fact, and where there is conflicting testimony, the [court] is the ultimate arbiter of the credibility of the witnesses."). This finding was not clearly erroneous. Second, the court did not err by concluding, based on defense counsel's testimony at the *Machner* hearing, that counsel provided Simmons with accurate advice about the forfeiture by wrongdoing doctrine. Defense counsel stated at the *Machner* hearing that he would have told Simmons that forfeiture by wrongdoing would

apply to Dana and the State could have used Dana's video statements if she failed to appear for the trial, which is not an inaccurate explanation of the doctrine. *See **State v. Baldwin***, 2010 WI App 162, ¶34, 330 Wis. 2d 500, 794 N.W.2d 769. Overall, Simmons merely disagrees with the court's credibility determinations and asks us to make different determinations, which we cannot and will not do.

¶37    The circuit court reasonably concluded that defense counsel provided accurate advice and that Simmons did not misunderstand that advice. Accordingly, counsel did not perform deficiently.    Simmons's ineffective assistance of counsel arguments fail.

**III.  Improper sentencing factor**

¶38    Simmons's final argument is that his due process rights were violated by the circuit court's improper reliance on his religion as a factor at sentencing.    We review a circuit court's sentencing decision for an erroneous exercise of discretion.  ***State v. Dalton***, 2018 WI 85, ¶36, 383 Wis. 2d 147, 914 N.W.2d 120.  The court erroneously exercises its sentencing discretion when it "actually relies on clearly irrelevant or improper factors."[11]  ***Id.***  In order to challenge his or her sentence, a defendant "must prove by clear and convincing evidence that: (1) the challenged factor is irrelevant or improper; and (2) the

---

[11] We note that before the circuit court, Simmons sought resentencing based on alleged improper factors *and* inaccurate information.  On appeal, Simmons appears to repeat some of the themes from his postconviction motion, stating, "At sentencing, the court explicitly relied on representations of Simmons's beliefs and lifestyle that are improper because they inaccurately malign his religious practices."  However, based on our review, it appears that Simmons's appellate arguments focus on his religion as an improper factor rather than inaccurate information.  Thus, we understand his argument to be that the court relied upon his religion as an improper factor at sentencing.

circuit court actually relied on that factor." ***State v. Dodson***, 2022 WI 5, ¶8, 400 Wis. 2d 313, 969 N.W.2d 225.

¶39 "Under the improper-factor prong, sentencing factors are proper when they inform valid sentencing objectives including 'the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others.'" ***Id.***, ¶9 (quoting ***State v. Gallion***, 2004 WI 42, ¶40, 270 Wis. 2d 535, 678 N.W.2d 197).[12] "Under the actual-reliance prong, we review the sentencing transcript as a whole and assess any allegedly improper comments within that context." ***Id.***, ¶10. "To prove actual reliance a defendant must identify where in the transcript the circuit court both gave 'explicit attention' to an improper factor and made the improper factor a part of the 'basis for the sentence.'" ***Id.*** (citation omitted). "Therefore, a defendant will fall short of proving actual reliance if the transcript lacks clear and convincing evidence that the factor was the sole cause of a harsher sentence." ***Id.***

¶40 Simmons is a Muslim, and he practices polygamy in accordance with his reading of the Qur'an. According to Simmons, "the State and others

---

[12] Secondary factors for the circuit court's consideration at sentencing include the following:

> (1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention.

***State v. Gallion***, 2004 WI 42, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197 (citation omitted).

portrayed Simmons's marital status as a result of Simmons manipulating [the] women, rather than a practice that is in accordance with his religious rights and beliefs. Many of these comments were either denigrating, mocking, or downright insulting." As a result of these statements, Simmons argues that the circuit court improperly relied on his religion at sentencing. *See, e.g.*, **State v. Fuerst**, 181 Wis. 2d 903, 913, 512 N.W.2d 243 (Ct. App. 1994) ("[T]he court is not permitted to consider a defendant's beliefs system and religious activities without a relevant relationship between those beliefs and the criminal activity.").

¶41 On appeal, Simmons admits that the circuit court did not explicitly mention Simmons's religion during its sentencing remarks. He contends, however, that "the court did explicitly adopt the narrative [from others] that portrayed Simmons as having twisted beliefs [and portrayed] his religious practices and lifestyle as manipulative and controlling." In particular, Simmons identifies two of the court's statements during sentencing.[13] First, the court said, "I consider [Simmons's] self-expressed belief that he owns his wives and children. I do consider the power and control he exercises over those who he has put under

---

[13] On appeal, Simmons identifies statements made by other individuals in the presentence investigation report (PSI) and at sentencing. For example, Mary's aunt stated in the PSI, "Mr. Simmons is trying to develop a cult with recruiting all these women to be his wives and he would be their master." At sentencing, Mary's grandmother said, "[Simmons] has manipulated [Mary's mother] into believing he is the only protector she has, even above his god, Allah. He has played the religion card over and over, making it a religion of convenience for him. [Simmons] is a master manipulator, and he manipulates anyone who is in contact with him." Simmons also argues that "[t]he prosecutor went along with this narrative at sentencing, arguing, 'There is nothing this [c]ourt will do here today or at any point in the future that will ever change the opinion of Terrance Simmons's faithful followers, his *girlfriends*.'"

None of these statements came from the circuit court. In order for Simmons to challenge his sentencing based on an improper sentencing factor, the *court* must have erroneously exercised its discretion by actually relying on an irrelevant or improper factor at sentencing. Accordingly, we will address only the court's statements.

his spell, examples of which are threats to kill those witnessing against him and members of their families." Second, the court stated:

> I consider Mr. Simmons is controlling and manipulative. [Mary's aunt] states he has sick and twisted beliefs and brainwashes people to think his way of thinking is right. That is evident from the [PSI], from the phone recordings that were played by the State today and by the statements made here in court today by both those who are victims of these assaults and those who are supportive of Mr. Simmons.

¶42   We agree with the State that the circuit court did not mention Simmons's religion, his "different" lifestyle, or his "cultural marriage" during sentencing.   The specific passages that Simmons quotes from the court's sentencing decision do not support Simmons's assertion that the court gave explicit attention to his *religion* or his *cultural marriages*.  Clearly, Simmons need not be either a Muslim or a polygamist in order to be manipulative, threatening, or exercise power and control over individuals in his life.  Simmons attempts to connect the court's statements to Simmons's religion and lifestyle choices by stating that the court "adopt[ed] the narrative" from others who made statements about Simmons.  However, there is simply no direct nexus between the negative qualities the court discussed and either the Muslim religion or polygamy such that we can conclude that the court's comments pertained specifically to Simmons's religion or his lifestyle choices, rather than a behavior pattern, his personality, his character, or his social traits, i.e., proper sentencing factors. *See supra* note 12.

¶43   Thus, we do not agree that the circuit court gave "explicit attention" or "specific consideration" to Simmons's religious beliefs or his cultural marriages.  *See **State v. Tiepelman**, 2006 WI 66, ¶14, 291 Wis. 2d 179, 717 N.W.2d 1 (citation omitted).  Instead, we conclude that the court discussed

appropriate sentencing factors and properly exercised its sentencing discretion. *See Gallion*, 270 Wis. 2d 535, ¶¶40-46.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.